# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)* | )<br>)<br>)<br>)<br>)<br>) |

Case No.   2:18-mj-001852

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

❏ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| | producing, attempting to produce child pornography, receipt and attempted receipt of child pornography, possession and attempted possession of child pornography; and enticement and persuasion of a minor to engage in sexual activity |

The application is based on these facts:

❏ Continued on the attached sheet.

❏ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: _____

_____
*Printed name and title*

## AFFIDAVIT

I, Garrett Fraser, being duly sworn, declare and state as follows:

### I.  AFFIANT BACKGROUND

1.   I am a Special Agent ("SA") with the United States Immigration and Customs enforcement (ICE), Homeland Security Investigations (HSI) and have been so employed since December of 2006.  I am presently assigned to the Office of the Assistant Special Agent in Charge, Ventura, California (HSI Ventura). While employed by HSI, I have investigated federal criminal violations related to child exploitation and child pornography. I have gained experience through training and everyday work relating to conducting these types of investigations and other types of investigations.  I have received training in the area of child pornography and child exploitation, and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in many forms of media including computer media.  Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2251 and 2252A.

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all

**Instrumentality Protocol**

conversations and statements described in this affidavit are related in substance and in part only.

## II. **SUMMARY/PURPOSE OF AFFIDAVIT**

3.   As set forth in detail below, Australian law enforcement reported to HSI that someone using the screen name THEHOLYDIVINES had posted images of a prepubescent girl to Website A.[1]  The images depict the girl in various stages of undress.  While most of the images do not technically appear to be child pornography, some lasciviously depict her genitals. THEHOLYDIVINES claimed to have obtained the images while communicating with the child depicted in the images, and that he was attempting to get her to send him fully naked images of herself.  The Internet Service Provider ("ISP") used by THEHOLYDIVINES resolves to the SUBJECT PREMISES.

4.   This affidavit is made in support of an application for a warrant to search 5265 Sycamore Creek Court, Santa Maria, California 93455 (the "SUBJECT PREMISES"), more fully described in Attachment A, incorporated by reference herein, for the evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2251(a) (producing, attempting to produce child pornography),  2252A(a)(2)(A) (receipt and attempted receipt of child pornography); 2252A(a)(5)(B) (possession and attempted possession of child pornography; and 2422(b)(enticement and persuasion of a minor to engage in sexual activity)

_____

[1] For investigative reasons, the true name of Website A is not disclosed herein.  However, it is known to law enforcement and will be provided to anyone executing the search warrant.

2

**Instrumentality Protocol**

(collectively, the "SUBJECT OFFENSES"), more fully described in Attachment B, incorporated by reference herein.

### III. STATEMENT OF PROBABLE CAUSE

**A.   Website A User THEHOLYDIVINES Posted Child Pornography She/he Claimed to Have Persuaded the Victim to Take**

5.   Except as otherwise stated, I learned the information below from reviewing the materials provided to HSI from the Australian Queensland Police Service ("AQPS") and from HSI Cyber Crimes Center's Child Exploitation Investigations Unit ("CEIU").

6.   In August 2017, AQPS contacted HSI about an AQPS investigation during which AQPS accessed Website A.  Website A allows users to post images and photos for other Website A users to view, post comments on, and download.  A member of AQPS accessed Website A and found that Website A user THEHOLYDIVINES had posted images depicting a prepubescent girl in various stages of undress, including images that appear to be child pornography.  Further, THEHOLYDIVINES claimed to have obtained the images while communicating directly with the minor girl (hereinafter the "Victim"), and was attempting to get her to send him fully nude images of herself.

7.   AQPS provided screen captures of Website A, which I have viewed.  These screen captures include the user profile of THEHOLYDIVINES.  Based on my review of the screen captures, I learned the following:

a.   THEHOLYDIVINES' user profile indicated that the account was established on August 23, 2017, the user's name was "Nicole," and her birthday is in November 2000.  The user

3

**Instrumentality Protocol**

included the following information:  "Just a girl who likes other girls younger than myself.  I'm 17 by the way.  My kik is thenikkifun.  Guys don't spam me with nudes I only like girls."

b.    Based on my training and experience, I know that such profile information is generally provided by a user when setting up a social media account, and that it is common for users to give false names in order to anonymize their activities on the Internet.  User-provided profile information is rarely verified by the social media provider; users could claim their name was the Easter Bunny or Santa Claus.  Based on my training and experience, individuals who distribute and/or receive child exploitative material will commonly try to hide their true identity by using false profile information.

c.    The user profile contained a "profile picture" depicting a blonde woman with an object in her mouth.  A profile picture is an image uploaded by the user of a social media account, intended to represent the account user in all its interactions across that social media platform.  Profile pictures often depict the actual user of an account, but can also depict any other image the user elects to upload.  It is unlikely this image depicts the true user of THEHOLYDIVINES account; according to a Google image search conducted by AQPS, the image appears on a dating website profile purporting to belong to a 25-year-old woman from Huntsville, Texas.

d.    The "thenikkifun" Kik account referenced in the profile, however, is likely an actual Kik account used by THEHOLYDIVINES.  Kik is a popular publicly available smartphone

4

Instrumentality Protocol

messenger application that allows individuals to communicate online for free.  Per the Kik law enforcement guide, users can send text, pictures, and videos.  Kik users are identified by a unique username.  By providing a Kik username in his/her profile, THEHOLYDIVINES was providing other Website A users a way to communicate with him/her outside of Website A.

8.   APQS also provided screen captures of an index of two photo albums that were posted on Website A by THEHOLYDIVINES, and the contents of the two photo albums posted by THEHOLYDIVINES.  All the photos in both albums appear to depict the same prepubescent girl, the Victim, who appears to be between eight and eleven years old.  The Victim has blondish-brown hair and brown eyes, and is wearing a white short sleeved shirt with reflective sequins, jean shorts with a floral design, orange and pink wristbands on her right wrist and a blue wrist ban on her left wrist.  Based on my training and experience, and the spatial proximity of the photos taken, it appears the Victim took these photos herself (photos taken of oneself are commonly referred to as "selfies").  The Victim's face is not visible in every photo.  However, based on clothing, the same or similar background in each of the photos, and the same physical attributes of the minor in the picture, I believe all the photos depict the same girl.  In some photos she is entirely clothed; in some she poses with a stuffed animal.  Others show her in various stages of undress, including images that depict her bare breasts and bare buttocks, images where she is entirely nude except for her panties.   While some of the photographs are

Instrumentality Protocol

clearly sexualized images, they may not technically depict child pornography.  Some, however, appear to lasciviously display her genitals and I believe them to be child pornography.

      a.   The first album, which contained 20 photographs, is labeled "Girl I met on kik."  THEHOLYDIVINES posted comments on the photo album page, indicating that he/she was communicating with the minor depicted in the images, and that he/she  was attempting to persuade her to send him/her fully nude images of herself.  Specifically, he/she stated:

> "I've shown her a lot.  I'm still trying to get all her clothes off.  Keep a look out on my profile I'm gonna post more pics as I get them."

THEHOLYDIVINES appears to have posted this comment approximately four times on August 23, 2017.  The album index indicated that the contents of the album depicted "kids."   Each of the photos in the album show the Victim posing by herself.  Most of these images depict her fully clothed, although some depict her pulling up her shirt to almost-but-not-quite expose her breasts, and others depict her opening her shorts to expose her panties.

      b.   The second photo album was called, "Girl I met on kik but better."  It contained a "forward," message posted at the top of the album from THEHOLYDIVINES, which provided information about how to access the contents of the album.  The forward read:

> "Kik me for the pass but you need to tell me how you got my kik and what you are offering to trade for my password."

Instrumentality Protocol

Based on my training and experience, this message would normally indicate that the photo album was password protected, and that Website A users would have to ask THEHOLYDIVINES for the password via Kik messenger.  However, AQPS indicated that the photo album was not password protected, as they were able to access the photos in this album simply by clicking on it, without entering a password into Website A.

       c.   The second album contained a total of 12 photos, each depicting the same Victim.  Based on the background of the photos, they appear to be taken in the same place as the photos in the first album.  Further, the Victim is wearing the same clothing as in the first album.  Like the images in the first album, the images depict the Victim in various stages of undress.  Some depict close-ups of her face, sometimes making silly faces, and one time puckering her lips, blowing a kiss at the camera.  Various images depict the Victim's exposed breasts, exposed buttocks, and depict her nude but for pink panties.  Some of the images depict her with her arm/s extended, making it appear that she is holding the camera/camera-phone up and taking the photographs herself.

       d.   Three of the images in the second album lasciviously exhibit the Victim's genitals:

       i.   One of the images depicts the Victim fully nude from the chin down.  She is seated, with her legs slightly apart, exposing her genitals.

       ii.   One of the images shows her from the neck down, seated with legs spread, and the camera focused on her

7

**Instrumentality Protocol**

genital area.  In this image, her genitals are partially visible on either side of the crotch of her pink panties.

       iii.  One of the images shows her bent over with her panties pulled down, exposing her buttocks.  Her genitals are also visible.

       iv.  Based on my training and experience, these images lasciviously exhibit the genitals of the minor Victim. It appears that the images were taken with the intent to appeal to the sexual interest of the viewer of the image – THEHOLYDIVINES.  This is based on the fact that the image is one in a series of increasingly sexual images, giving tantalizing glimpses of breasts, buttocks, and puckered lips.  It is also based on context, including THEHOLYDIVINES' claim that he obtained the pictures from the Victim herself while communicating with her on Kik, that he had, "shown her a lot" and was trying to persuade her to take more and more explicit pictures, specifically nude images.

**B.   THEHOLYDIVINES Accessed Website A and Kik From the SUBJECT PREMISES**

   9.  Website A is hosted Russia.  From Russian law enforcement, APQS learned that the email account associated with THEHOLYDIVINES' Website A user account was "Theholy11divines@gmail.com." Further, Russian law enforcement provided APQS with a data log indicating dates and times

Instrumentality Protocol

THEHOLYDIVINES accessed Website A, and the IP Addressed used by THEHOLYDIVINES to access Website A on those occasions.[2]

10. According to the data provided by AQPS, the same IP address used to set up THEHOLYDIVINES' Website A account on August 23, 2017 (the "Target IP Address") was subsequently used by THEHOLYDIVINES to access Website A on multiple occasions throughout August 23, 2017 and August 26, 2017.[3]

11. The Target IP Address was also used to access Kik accounts associated with THEHOLYDIVINES. As set forth above, the Kik account posted in the THEHOLYDIVINES' Website A user profile is "thenikkifun." Kik usernames are publicly accessible to anyone with a Kik account. Using this feature, HSI found a Kik account with the username "thenikkifun." Like THEHOLYDIVINES' account on Website A, the name associated with "thenikkifun" Kik account was "Nikki." In addition, HSI found a Kik account with the username "theholy11divines." This is almost identical to the email address associated with THEHOLYDIVINES' Website A account, theholy11divines@gmail.com. The name associated with "theholy11divines" Kik account was also

---

[2] Based on my training and experience I know that an IP Address (Internet Protocol Address) is a unique number assigned to each computer connected to the Internet. Each computer connected to the Internet is assigned a unique IP address while it is connected. The IP address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP address is only assigned for the duration of that online session.

[3] HSI checked Website A in June 2018 and found that THEHOLYDIVINES user account was no longer active.

Instrumentality Protocol

"Nikki."  Both of these accounts appear to be active as of mid-June 2018.

12.  Kik provided HSI with account information for the "thenikkifun" and "theholy11divines" Kik accounts.  This information included the following:

a.   The "thenikkifun" Kik account was created on August 23, 2017.  When setting up the account, the user gave email address "theholy11divjfnchvcines@gmail.com."  The account was created from an iPhone connected to the internet via the Target IP Address.  Further, between August 23 and September 2, 2017, the Target IP Address was used to access "thenikkifun" Kik account on multiple occasions.

b.   The "theholy11divines" Kik account was created on August 11, 2017, with an iPhone.  Like THEHOLYDIVINES Website A account and the "thenikkifun" Kik account, this Kik account was accessed via the Target IP Address.

13.  According to Comcast Cable Communications, between June 13, 2017 and October 11, 2017, the Target IP Address was consistently assigned to Comcast high speed Internet subscriber Brant Coolidge, at the SUBJECT PREMISES.  Further, Comcast provided the email address associated with the Coolidge account: The9Divines@comcast.net.

14.  Based on my training and experience, I know that an IP Address can only be assigned to one Internet user at any given time.  As set forth above, in August 2017, the Target IP Address was repeatedly used by THEHOLYDIVINES to access Website A, the "thenikkifun" Kik account, and "theholy11divines" Kik account.

10

**Instrumentality Protocol**

During this time period, the Target IP Address was exclusively assigned to the SUBJECT PREMISES.  This means that the individual who has been communicating with the minor victim and persuading her to send him sexual images of herself, including child pornography, and then posted those images to Website A, did so from the SUBJECT PREMISES.

15.  TLO is a proprietary database that searches public records and links them to individuals.  I conducted a search of the SUBJECT PREMISES and the name, "Brant Coolidge" in TLO.  The search revealed that a Brant Coolidge, born in November 1993, is associated with the SUBJECT PREMISES.

16.  I looked up California (CA) Department of Motor Vehicles ("DMV") records for Brant Coolidge.  His CA Driver License bears his photograph, but no address.  This is consistent with individuals associated with law enforcement.  On May 4, 2018, I conducted surveillance at the SUBJECT PREMISES. I observed a silver Toyota Tacoma parked in the driveway of the SUBJECT PREMISES, bearing California license plate number (CALP#)8R05500.  According to DMV records, this car is registered to Brant Coolidge and Howard Coolidge; however, the address associated with this for this license plate is "Lompoc PD."

17.  On May 4, 2018, I observed Brant Coolidge leave the SUBJECT PREMISES, get into the silver Tacoma registered to Brant Coolidge, and drive away.

11

**Instrumentality Protocol**

## IV.   <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

18.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible

12

**Instrumentality Protocol**

to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

          b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

          c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of

13

Instrumentality Protocol

data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

          d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[4] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the

---

[4] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

Instrumentality Protocol

Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was

15

Instrumentality Protocol

once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be

16

Instrumentality Protocol

necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.

17

Instrumentality Protocol

A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

19.  As discussed herein, based on my training and experience I believe that digital devices will be found during the search.  Specifically, there is probable cause to believe that a smartphone devices was used to commit the offenses discussed herein.

a.    I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition.  Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

Instrumentality Protocol

b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID. Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

c.   If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device

Instrumentality Protocol

through his or her face.  To activate the facial-recognition feature, a user must hold the device in front of his or her face.  The device's camera analyzes and records data based on the user's facial characteristics.  The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face.  No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement).  Several companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017).  Apple calls its facial-recognition unlock feature "Face ID."  The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.  As explained above, the Kik accounts associated with THEHOLYDIVINES were created using an iPhone.

　　　　d.　While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data.  The

20

Instrumentality Protocol

human iris, like a fingerprint, contains complex patterns that are unique and stable.  Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light.  Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels.  A user can register one or both eyes to be used to unlock a device with these features.  To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes.  The device is then unlocked if the camera detects the registered eye.  Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features.  In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features. Windows Hello has both a software and hardware component, and multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

20.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode

**Instrumentality Protocol**

or password.  Moreover, in some instances, biometric features
are considered to be a more secure way to protect a device's
contents.

21.  I also know from my training and experience, as well
as from information found in publicly available materials
including those published by device manufacturers, that
biometric features will not unlock a device in some
circumstances even if such features have been enabled.  This can
occur when a device has been restarted or inactive, or has not
been unlocked for a certain period of time.  For example, with
Apple's biometric unlock features, these circumstances include
when: (1) more than 48 hours has passed since the last time the
device was unlocked; (2) the device has not been unlocked via
Touch ID or Face ID in eight hours and the passcode or password
has not been entered in the last six days; (3) the device has
been turned off or restarted; (4) the device has received a
remote lock command; (5) five unsuccessful attempts to unlock
the device via Touch ID or Face ID are made; or (6) the user has
activated "SOS" mode by rapidly clicking the right side button
five times or pressing and holding both the side button and
either volume button.  Biometric features from other brands
carry similar restrictions.  Thus, in the event law enforcement
personnel encounter a locked device equipped with biometric
features, the opportunity to unlock the device through a
biometric feature may exist for only a short time.  I do not
know the passcodes of the devices likely to be found during the
search.

**Instrumentality Protocol**

22.   In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features (such as with Touch ID devices, which can be registered with up to five fingerprints), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require any individual who is found at the SUBJECT PREMISES and reasonably believed by law enforcement to be a user of the device to unlock the device using biometric features in the same manner as discussed in the following paragraph.

23.   For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, during the execution of the search, where an individual is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is (a) located at the

23

**Instrumentality Protocol**

SUBJECT PREMISES and (b) falls within the scope of the warrant:
(1) compel the use of the person's thumb- and/or fingerprints on
the device(s); and (2) hold the device(s) in front of the face
of the person with his or her eyes open to activate the facial-,
iris-, and/or retina-recognition feature.  With respect to
fingerprint sensor-enabled devices, although I do not know which
of the fingers are authorized to access any given device, I know
based on my training and experience that it is common for people
to use one of their thumbs or index fingers for fingerprint
sensors; and, in any event, all that would result from
successive failed attempts is the requirement to use the
authorized passcode or password.

24.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

//

**Instrumentality Protocol**

## V. <u>CONCLUSION</u>

25. For all the reasons described above, there is probable cause to believe that evidence of violations of the Subject Offenses, as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES, as further described above and in Attachment A of this affidavit.

_____
Garrett Fraser, Special Agent
Homeland Security
Investigations

The magistrate judge has viewed an image described in paragraph 11(b), above, depicting the face of the girl referred to herein as the "Victim," that the affiant alleges is a minor, and has viewed the images/videos described in paragraphs 11(c)(i), (ii), and (iii) above, that the affiant alleges are lascivious and, thereafter, placed them inside a sealed envelope and initialed across the seal.  The affiant has taken custody of the envelope and will maintain custody until all appeals have been exhausted.  _____ (initials)

Subscribed to and sworn before me
this _____ day of July, 2018.

_____
THE HON.
UNITED STATES MAGISTRATE JUDGE

**Instrumentality Protocol**

## ATTACHMENT A

### PREMISES TO BE SEARCHED

The SUBJECT PREMESIS is the entire property located at 5265 Sycamore Creek Court Santa Maria, California 93455.  The SUBJECT PREMESIS contains a single-family residence.  The home is tan with white trim, a brown composite roof, and a brown front door that faces the street.  There is an attached two-car garage on the north side of the residence, and the  numbers "5265" are posted next to the garage door.  The SUBJECT PREMISES includes any person, vehicle, shed, barn, or structure located at 5265 Sycamore Creek Court Santa Maria, California 93455.

Instrumentality Protocol

**ATTACHMENT B**

ITEMS TO BE SEIZED

1.  The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2251(a) (producing, attempting to produce child pornography), 2252A(a)(2)(A) (receipt and attempted receipt of child pornography); 2252A(a)(5)(B) (possession and attempted possession of child pornography; and 2422(b)(enticement and persuasion of a minor to engage in sexual activity) (collectively, the "SUBJECT OFFENSES"), namely:

    a.  Any records, documents, programs, applications, or materials that pertain to Website A[5], including but not limited to any records, documents, programs, applications, or materials relating to the username "THEHOLYDIVINES" or tending to identify the true identity of the individual employing the username "THEHOLYDIVINES;"

    b.  Any records, documents, programs, applications, or materials that pertain to Kik; including but not limited to any records, documents, programs, applications, or materials relating to Kik usernames "thenikkifun" or "theholy11divines" or tending to identify the true identity of the individual employing these usernames;

---

[5] For investigative reasons the website known herein as "Website A" is not identified, but is known to law enforcement and will be made known to those executing the search warrant.

ii

Instrumentality Protocol

c.    Any records, documents, programs, applications, or materials that pertain to the email address "Theholy11divines@gmail.com;" including but not limited to any records, documents, programs, applications, or materials relating to the target's username or tending to identify the true identity of the individual using this email address;

d.    Any records, documents, programs, applications, or materials, including but not limited to any images, videos, or communications in any form, pertaining to the minor girl depicted in the photo albums posted by THEHOLYDIVINES to Website A (the "Victim");

e.    Child pornography, as defined in 18 U.S.C. § 2256(8);

f.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography;

g.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, order, requesting,

**Instrumentality Protocol**

trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256;

h.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

i.   Any records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings;

j.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider;

k.   Any communications, in any form, with minors;

l.   Any communications, in any form, with adults regarding sex with minors;

m.   Any records, documents, programs, applications, or materials that pertain to sexual activity with minors;

Instrumentality Protocol

n.    Any records, documents, programs, applications, or materials that pertain to accounts with any Internet Service Provider;

o.    Credit card information, including, but not limited to, bills and payment records.

p.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

q.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.  evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

v

Instrumentality Protocol

vi.   passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

viii.    records of or information about
Internet Protocol addresses used by the device;

ix.   records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart

**Instrumentality Protocol**

phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching any digital devices in the SUBJECT ITEMS (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

**Instrumentality Protocol**

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime

viii

Instrumentality Protocol

was encountered, including how it was immediately apparent contraband or evidence of a crime.

       d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

       e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

       f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

       g.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

Instrumentality Protocol

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

2.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

x

Instrumentality Protocol

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

3.    During the execution of this search warrant, where any person present at the SUBJECT PREMISES is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is (a) located at the SUBJECT PREMISES and (b) falls within the scope of the warrant the law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

4.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

Instrumentality Protocol